UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Frankfort)

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | Civil Action No. 3: 11-43-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| VILLASPRING HEALTH CARE | ) | **MEMORANDUM OPINION** |
| CENTER, INC., et al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

This matter is pending for consideration of the United States' Motion to Disqualify Defendants' Counsel. [Record No. 17] The United States asserts that attorney Christopher A. Melton's representation of Defendants Villaspring Health Care Center, Inc., Carespring Health Care Management, LLC, and Barry N. Bortz (collectively, "Villaspring"), constitutes a conflict of interest in violation of the Kentucky Rules of Professional Conduct because Melton previously participated in the investigation of Villaspring in his capacity as Assistant Attorney General of the Commonwealth of Kentucky. As a result, the United States seeks disqualification of Melton, his firm, and all of his co-counsel in this action. Villaspring counters that no conflict exists and that disqualification would deprive Villaspring of its chosen counsel. It asserts that the harm it would suffer as a result of disqualification would exceed the harm to the United States from the defense team's continued representation. For the reasons discussed below, the Court will grant, in part, the United States' motion to disqualify.

-1-

## I. BACKGROUND

Melton was employed as an Assistant Attorney General in the Medicaid Fraud Control Unit ("MFCU") from January 2008 to August 2010. [Record No. 20, p. 2] During his employment, Melton was assigned as co-counsel, along with Assistant Attorney General Jennifer Wintergerst, to an investigation involving allegations of criminal abuse and neglect at the Villaspring Health Care Center. [*Id.*] The investigation was intended to determine whether criminal charges should be brought against the "individual care givers at Villa Springs [sic], the owners of Villa Springs [sic], or the corporate entity or entities themselves." [Record No. 17-2, p. 1] At the conclusion of the investigation, Melton "recommended declining prosecution." [Record No. 20, p. 3] As a result, in February 2010, the MFCU "placed the case in 'inactive status' and contacted the United States Attorney's Office for consideration of potential civil claims under the False Claims Act." [*Id.*] During the referral process, Melton met with representatives of the United States Attorney's Office and provided that office "with non-privileged documentary material regarding Villaspring that he had collected in the course of leading the criminal investigation." [Record No. 17-1, p. 3]

In August 2010, Melton entered private practice as an associate attorney with Weber & Rose in Louisville, Kentucky. [Record No. 20, p. 4] In July 2011, "Melton was contacted by Alan Schabes, one of Villaspring's counsel, who asked to assist him in representing that company in a False Claims Act suit brought by the federal government." [*Id.*] Before he accepted, Melton confirmed with the Attorney General's Office that the investigation against Villaspring was inactive, consulted with the Ethics Officer at Weber & Rose, and sought and

received a "Hotline Opinion" from the Kentucky Bar Association stating that the representation did not constitute a conflict of interest. [*Id.*, p. 5] Melton did not, however, seek or receive the Kentucky Attorney General's written consent to the representation. [Record No. 17-1, p. 3] Since accepting the representation, Melton has taken an active role in Villaspring's defense.

## II.　　LEGAL STANDARD

It is axiomatic that a district court has inherent authority to disqualify an attorney as a sanction for professionally unethical conduct. *Umphenour*, 2008 WL 2785609, at *2. That authority, however, is not unfettered. *Id.* Disqualification is a "drastic measure" that the Court should hesitate to impose, because it serves to "separate[] a party from the counsel of his choice with immediate and measurable effect." *Zurich Ins. Co. v. Knotts*, 52 S.W.3d 555, 560 (Ky. 2001). "The extreme sanction of disqualification should only be utilized when there is a reasonable possibility that some specifically identifiable impropriety actually occurred, and where the public interest in requiring professional conduct by an attorney outweighs the competing interest of allowing a party to retain counsel of his choice." *SST Castings, Inc. v. Amana Appliances, Inc.*, 250 F. Supp. 2d 863, 865 (S.D. Ohio 2002) (internal quotation marks and citations omitted).

Motions to disqualify are governed by two sources of authority: local rules and federal common law. *Umphenour v. Mathias*, No. 07-427-KSF, 2008 WL 2785609, at *2 (E.D. Ky., July 16, 2008). Rule 83.3 of the Joint Local Rules for Civil Practice for the United States District Courts of the Eastern and Western Districts of Kentucky provides that an attorney practicing before the Court is subject to discipline upon a showing that he or she is guilty of

unprofessional conduct, as defined by the Kentucky Rules of Professional Conduct. L.R. 83.3(a)(2), (c). Thus, the "attorneys of record in this action are subject to the Kentucky Rules of Professional Conduct and the judicial decisions interpreting those rules." *Umphenour*, 2008 WL 2785609, at *2. Additionally, "with the wide-spread acceptance of the American Bar Association's Model Rules of Professional Conduct, we now look to the codified Rules of Professional Conduct for guidance" in deciding questions of attorney disqualification. *Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. Alticor, Inc.*, 466 F.3d 456, 457 (6th Cir. 2006).

Rule 1.11 of the Kentucky Rules of Professional Conduct guides the Court's review of the conduct challenged by the United States. This rule governs conflicts of interest for "former and current government officers and employees." It provides:

> (a) Except as law may otherwise expressly permit, a lawyer who has formerly served as a public officer or employee of the government:
>
> (1) is subject to Rule 1.9(c); and
>
> (2) shall not otherwise represent a client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency gives its informed consent, confirmed in writing, to the representation.
>
> (b) When a lawyer is disqualified from representation under paragraph (a), no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter unless:
>
> (1) the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and
>
> (2) written notice is promptly given to the appropriate private public body or government agency to enable it to ascertain compliance with the provisions of this Rule.

(c) Except as law may otherwise permit, a lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person.

Ky. S. Ct. R. 3.130(1.11) [hereafter, SCR 3.130].

Kentucky Rule of Professional Conduct 1.11 derives from ABA Model Rule of Professional Conduct 1.11, which serves to avoid the appearance of impropriety on the part of current and former government employees.[1] The comments to Rule 1.11 specifically state that "where the successive clients are a government agency and another client, public or private, the risk exists that power or discretion vested in that agency might be used for the special benefit of the other client." SCR 3.130(1.11), cmt. 4. The disqualification of an attorney in a case implicating Rule 1.11, therefore, serves to "forestall the charge that a particular position taken by a public official was in anticipation of private employment." *Woods*, 537 F.2d at 814; *see also Brown v. D.C. Bd. of Zoning Adjustment*, 486 A.2d 37, 45 (D.C. 1984) (explaining that a rule prohibiting "side-switching" addresses the concern that "the lure of private practice may undermine a government attorney's responsibilities to the public" and noting that without such a rule, "a government attorney could structure a case in a way that might leave room for later private employment").

---

1   Villaspring contends that the "major reason" for this rule is to "protect confidential client information." [Record No. 20, p. 13] While that is certainly an important purpose, Rule 1.11 serves a larger goal: to avoid the perception that a "former government lawyer's representation of a client could call into question his overall conduct as a government official, as well as the decision he reached in a particular matter." *Woods v. Covington Cnty. Bank*, 537 F.2d 804, 814 (5th Cir. 1976).

## III. ANALYSIS

Rule 1.11 dictates that Melton must be disqualified from further representation in this case.[2] He represents a client in connection with the same matter in which he participated "personally and substantially" as an Assistant Attorney General, and the government agency has not given its informed consent to the representation. *See* SCR 3.130(1.11(a)(2)).

The fact that Melton received an "Ethics Hotline Opinion" advising him that his representation of Villaspring would not constitute a violation of Rule 1.11 does not immunize him from disqualification in this matter. First, the opinion is not binding on this Court. [*See* Record No. 20-5, p. 2] Second, as the United States points out, the opinion was based, in part, on incomplete information. [Record No. 25, p. 9] Melton's letter requesting an opinion downplayed the relationship between the state investigation and the federal lawsuit. He wrote: "Following my decision not to prosecute, I was contacted by Andrew Sparks, an Assistant United States Attorney with the Eastern District." [Record No. 20-6, p. 1] This language suggests that the Attorney General's office played a more passive role in the transfer of the investigation to the United States than it actually did. In fact, the Attorney General's office initiated contact with the U.S. Attorney's Office to refer the case for a civil action. Similarly, Melton's use of the passive voice in his letter downplays his own role in the investigation. For example, he wrote that "an investigation was conducted by that office," therefore suggesting that

---

2     The United States argues that Melton's representation of the defendants also violates SCR 3.130(1.9), which governs duties to former clients. However, the application of Rule 1.11 presents a stronger challenge to Melton's representation in this case. Because Rule 1.11 is sufficient to require disqualification, this Court will not enter into an analysis of Rule 1.9.

his only involvement in the matter was the decision not to pursue criminal neglect charges. [*Id.*] This is an understatement of his involvement in the investigation.

Moreover, the letter does not fully explain the extent of the similarities between the two cases. Melton indicated that the federal suit "alleges billing of services by the facility that were so substandard that they were basically worthless." [*Id.*] However, he did not clarify with any particularity the fact that the federal suit stemmed directly from the factual circumstances investigated by the MFCU. The Court does not suggest that Melton was intentionally misleading, merely that the Ethics Hotline Committee did not have the benefit of the entire record when it decided that the state investigation was not the same "matter" as the "impending investigation into possible violations under the False Claims Act." [Record No. 20-5, p. 1] As discussed below, whether two "matters" are the same is necessarily a fact-intensive inquiry, and a two-page letter is inadequate to fully inform even someone with "extensive experience interpreting the Kentucky Rules of Professional Conduct" as to the propriety of the representation in this case. [*See* Record No. 20, p. 8] For these reasons, the Ethics Hotline opinion does not shield Melton or his firm from disqualification.

**A.** **Melton and Weber & Rose Are Disqualified Under Rule 1.11(a)(2)**.

Melton is disqualified, under Rule 1.11(a)(2), from further representation of Villaspring in this case. As an initial matter, there is no standing requirement in Rule 1.11, so the United States does not need to be a former client of Melton's to seek disqualification. Paragraph (a)(2) of Rule 1.11 applies "regardless of whether a lawyer is adverse to a former client." SCR 3.130(1.11) cmt. 3. Therefore, the Court need not discuss the parties' arguments regarding

standing, as that analysis would only be appropriate if the Court were relying on Rule 1.9 to disqualify Melton.

Under Rule 1.11(a)(2), a former government attorney "shall not otherwise represent a client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency gives its informed consent, confirmed in writing, to the representation." SCR 3.130(1.11(a)(2)).

### 1. Melton's Representation of Villaspring Concerns the Same "Matter" as the Investigation He Conducted for the MFCU.

The Kentucky Attorney General's criminal investigation of Villaspring and the current federal civil suit against Villaspring constitute the same matter for the purposes of Rule 1.11. The term "matter" is defined as "any judicial or other proceeding, application, . . . claim, controversy, investigation, charge, accusation, arrest or other particular matter involving a specific party or parties." SCR 3.130(1.11(e)). Villaspring asserts that "this federal action for violation of the federal False Claims Act is not the same judicial proceeding, or the same investigation, as the state criminal investigation for abuse or neglect of an adult in which Mr. Melton participated." [Record No. 20, p. 12] However, the comments to Rule 1.11 indicate that a matter "may continue in another form." SCR 3.130(1.11) cmt. 10. Thus, the issue is not as simple as Villaspring maintains, and the fact that one matter was criminal and one is civil is not determinative. Instead, the Court must analyze the matters' substance, rather than their forms. To determine whether two matters are the same, the court should "consider the extent to which the matters involve the same basic facts, the same or related parties, and the time elapsed." *Id.*

Here, the two matters involve the same basic facts. The state investigation into allegations of criminal neglect led directly to the current suit, which alleges that Villaspring violated the federal False Claims Act by "seeking, and receiving, substantial reimbursement from the Medicare and Kentucky Medicaid programs" for providing care that was "either non-existent or so inadequate as to be worthless." [Record No. 1, p. 1] The "worthless" services at issue in the federal civil case are the same services investigated by the state in the context of criminal neglect. Indeed, the United States identifies no fewer than eleven items contained in the federal complaint that were obtained from the State's investigation. [Record No. 25, pp. 4-5]

Additionally, the two matters involve closely related parties. Villaspring maintains that the parties to a state criminal action would have been "the Commonwealth of Kentucky and Ms. Berling, neither of whom are parties to this action." [Record No. 20, p. 12] However, the investigation is the "matter" at issue here, not the criminal case that was never pursued. The Attorney General's Office investigated "individual care givers at Villa Springs [sic], the owners of Villa Springs [sic], or the corporate entity or entities themselves," not just Ms. Berling. [Record No. 17-2, p. 1] Thus, the state matter involved an investigation of the very parties that are defendants in the current federal case. Further, the Kentucky Attorney General's Office and the United States Attorney's Office are sufficiently related because they shared information and conferred about the merits of the instant action. Therefore, the matters involve the same parties on one side and related parties on the other.

Finally, the time elapsed between the two matters was not enough to make them separate matters: Melton and Wintergerst "provided their final recommendation regarding potential criminal charges" in the state investigation in February 2010, and the United States filed suit

against Villaspring in July 2011. [*Id.*, p. 3] Melton agreed to assist Villaspring's defense counsel in this federal case less than one year after he resigned as Assistant Attorney General. [Record No. 20, p. 4] In summary, because the two matters involve the same basic facts, the same defendant and related prosecutors, and the time elapsed between the events was not significant, the two matters are the same for Rule 1.11 purposes. *See* SCR 3.130(1.11) cmt. 10.

### 2. Melton's Participated Personally and Substantially in the Matter as a Government Attorney.

Melton personally and substantially participated in the state's investigation of Villaspring during his tenure as Assistant Attorney General. He "played an active role in reviewing the evidence, providing legal advice to investigators, and making recommendations to supervisors." [Record No. 17-2, p. 2] The fact that the criminal investigation had been initiated two years before Melton's employment with the Kentucky Attorney General's Office does not change the fact that he played a leading and active role in the investigation for over a year and a half. [*See* Record No. 20, pp. 2-3] Melton reviewed evidence, communicated with Villaspring's defense counsel, participated in interviews, and met with the United States Attorney's Office about the investigation. [Record No. 17-3, p. 2] This constitutes personal and substantial participation in the matter.

### 3. The Government Agency Did Not Consent to Melton's Representation of Villaspring.

Finally, the Office of the Attorney General did not consent to Melton's representation in this matter. [Record No. 17-2, pp. 3-4] The extent of Melton's contact with the Attorney General's Office was to confirm that the investigation was still inactive. [Record No. 20, p. 5]

He did not obtain the agency's oral consent, much less its "informed consent, confirmed in writing, to the representation." *See* SCR 3.130(1.11(a)(2)).

Melton's representation of Villaspring, therefore, violates Rule 1.11(a)(2). Due to this violation, and the appearance of impropriety that it creates, Melton is disqualified from further representation in this case. Furthermore, because Melton is disqualified from representing Villaspring, the law firm of Weber & Rose is also disqualified pursuant to Kentucky Rules of Professional Conduct 1.10 and 1.11(b), as Villaspring concedes. [Record No. 20, p. 15 n.4]

### B. Melton and Weber & Rose Are Disqualified Under Rule 1.11(c).

Kentucky Rule of Professional Conduct 1.11(c) also provides grounds for disqualifying Melton and his firm. Rule 1.11(c) serves to prevent a former government employee from representing a private client in a matter in which the former employee has "confidential government information." Confidential information is defined as "information that has been obtained under governmental authority and which, at the time this Rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and which is not otherwise available to the public." SCR 3.130(1.11(c)). Villaspring maintains that "Melton learned no confidential information in the course of his involvement in the investigation that was not already known to Villaspring," since Villaspring would necessarily have been the source of any information gained during the investigation.[3] [Record No. 20, p. 4] However, this argument ignores the fact that some of the information was obtained from

---

[3] The Court finds unpersuasive Villaspring's argument that Melton does not possess confidential information because he "surrendered all files and notes in his possession to the Office of the Attorney General, who thereafter placed such files in storage." [Record No. 20, p. 14] Physical possession of evidence is not at issue here.

interviews with former employees of Villaspring. [Record No. 17-3, p. 2] Moreover, Melton has confidential government information in the form of strategic insights, such as his knowledge of the strengths and weaknesses of the evidence compiled against Villaspring. *See United States v. Philip Morris, Inc.*, 312 F. Supp. 2d 27, 43 (D.D.C. 2004) (noting that the attorney's "insights into the strengths and weaknesses of the Government's evidence regarding alleged tobacco fraud is exactly the kind of information [received during the first representation] . . . that might be useful to the second [representation]" (internal quotation marks omitted)). All of this information was passed on to the United States, which is now using that information to pursue the current action against Villaspring. [Record No. 20, p. 3 ("Melton met with counsel for the plaintiff and explained the reasons for his decision not to pursue criminal abuse and neglect charges.")] Therefore, the Court concludes that Melton acquired "confidential government information" in his role as a public attorney. He may not now use that information to benefit his client, Villaspring, to the "material disadvantage" of the United States. Accordingly, Melton and his firm are also disqualified under Rule 1.11(c).

### C. Melton's Co-Counsel Is Not Disqualified.

The United States has also moved that Melton's co-counsel and their firms be disqualified. [Record No. 17] In support, the government argues that Melton's co-counsel has been tainted by Melton's conflict of interest. Villaspring counters that disqualification of the entire defense team would be inappropriate.

Generally, even if an attorney is disqualified for a conflict of interest, his co-counsel will not be disqualified "absent actual evidence of disclosure of client confidences." *Baker v. Bridgestone/Firestone, Inc.*, 893 F. Supp. 1349, 1361 (N.D. Ohio 1995). The burden is on the

party seeking disqualification to prove that the co-counsel has received confidential information from the disqualified attorney. *Id.* at 1364. The party may present either direct or circumstantial evidence, such as "substantial communications, joint preparation for litigation or the apparent receipt of confidences." *Id.* A "longstanding personal and professional relationship" between co-counsel will afford greater weight to any such circumstantial evidence. *Id.* at 1365. Such circumstantial evidence raises a presumption that co-counsel has been tainted; however, that presumption can be rebutted with "material, probative evidence that points toward non-disclosure." *Id.* at 1364. Finally, even if this analysis reveals that co-counsel has been tainted, the trial court "should not order disqualification without first balancing less drastic alternatives with the opposing party's right to be represented by the counsel of his choosing." *Id.* at 1365.

In this case, there is no proof of actual disclosure. Melton has been involved in "joint preparation for litigation" with his co-counsel, which normally would raise the presumption of shared confidences. However, in light of the fact that the Court has decided this issue under Rule 1.11 rather than 1.9, the Court's concern is less with the potential for disclosure of client confidences and more with the appearance of impropriety involved in a former government attorney defending the subject of his earlier investigation. Additionally, there is no longstanding association between Melton and his co-counsel: this is the first case on which they have collaborated, and there is no evidence of personal friendship. *See id.* at 1352, 1365 (finding a "longstanding personal and professional relationship" between co-counsel whose "shared interest in flying led to a mutual friendship" before filing the lawsuit from which they were disqualified). Moreover, the affidavits of Melton's co-counsel rebut any presumption of disclosure that arises from the circumstantial evidence of their "joint preparation for litigation." [Record Nos. 20-2,

20-3, 20-4] Therefore, without actual evidence of disclosure or at least stronger circumstantial evidence, the Court is unwilling to take the drastic measure of disqualifying Villaspring's entire defense team. Keeping in mind that the "extreme sanction of disqualification should only be utilized when there is a reasonable possibility that some specifically identifiable impropriety actually occurred," *SST Castings, Inc.*, 250 F. Supp. 2d at 865, the Court finds that disqualification of Melton's co-counsel would unduly disadvantage Villaspring and is not necessary in this case at this point in the proceedings.

## IV. CONCLUSION

Melton's representation of the defendants in this action violates Kentucky Rules of Professional Conduct 1.11(a)(2), and 1.11(c). Therefore, he and his firm are disqualified from further representation of the defendants. However, Melton's co-counsel will not disqualified at this time based on the information presented. Accordingly, it is hereby

**ORDERED** that the United States' Motion to Disqualify Defendants' Counsel [Record No. 17] is **GRANTED**, in part. It is further **ORDERED** that attorney Christopher A. Melton and the law firm of Weber & Rose, P.S.C., are disqualified from any further representation of the defendants in this action. Further, the disqualified attorney and firm shall not confer further with any defendant or with any other attorney representing any defendant in this action.

This 7th day of November, 2011.



Signed By:
*Danny C. Reeves* DCR
United States District Judge